MARY NOLAN v. WILLIAM H. GLYNN, Appellant.

**Breach of marriage contract:** EVIDENCE: CROSS-EXAMINATION OF PLAIN-
1 TIFF. In this action for breach of marriage contract and for seduction, the cross-examination of plaintiff should have been permitted for the purpose of showing that plaintiff sought to have a female employee of the bank of which defendant was cashier discharged, on the ground that defendant was under her influence, and that later she changed her mind on the subject and sought to have defendant discharged, stating in each instance that if this was done she would not prosecute the action.

**Same:** EVIDENCE: PRIVILEGED COMMUNICATIONS: WAIVER. While one
2 testifying to a consultation with a physician at a certain time may waive the privilege with respect to that conversation, such waiver does not extend to a prior consultation or examination by the physician, or the purpose for which the physician prescribed for the party on the previous occasion.

**Same:** EVIDENCE OF MARRIAGE CONTRACT: CONCLUSION. The under-
standing of the members of the family of one of the contracting
parties that they were to marry is not competent evidence of an
agreement to marry, in a suit for breach of promise. Evidence of
that character is objectionable as the conclusion of the witness.

**Same:** DAMAGES: EVIDENCE. Seduction accomplished through a prom-
ise of marriage, and pregnancy resulting therefrom, may be shown
in an action for damages for breach of the marriage promise; but
abortion even though at the instance of the defendant cannot be
shown in such an action: as abortion is only an element of damage
in an action for seduction.

**Same:** SEDUCTION: PLEADINGS: DAMAGES: INSTRUCTIONS. Causes of
action for breach of promise to marry and for seduction may be
alleged in the same action, but should be stated in separate counts:
where, however, these matters were all alleged in one count and,
without objection to the form of pleading, the court received evi-
dence and gave instructions on the theory that both causes of
action were alleged, an instruction authorizing recovery for an ele-
ment of damages applicable only to an action for seduction was not
prejudicial and therefore not reversible error.

*Appeal from Warren District Court.*—HON. LORIN N. HAYS,
Judge.

THURSDAY, SEPTEMBER 25, 1913.

ACTION for damages because of breach of promise to
marry and the seduction of plaintiff resulted in judgment
against defendant, from which he appeals.—*Reversed.*

*Berry & Watson,* and *John A. Guiher,* for appellant.

*C. A. Robbins* and *A. W.* and *Phil. R. Wilkinson,* and
*A. V. Proudfoot,* for appellee.

LADD, J.—The defendant began paying attentions to
plaintiff in 1901, and continued so to do until some time in
1909. The petition alleged that they became engaged to marry
in October, 1904; that later he seduced her, and when she be-
came pregnant advised and caused an abortion to be commit-

ted upon her; and that, after repeatedly postponing marriage, finally he declined to carry out his promise. The answer was a general denial. The testimony of plaintiff tended to sustain these allegations of the petition, and is somewhat corroborated by the letters of the defendant, while the latter, though admitting having visited plaintiff during the period stated, denied ever having proposed or promised marriage, and testified that he had never had intercourse with her or known of her pregnancy or of the commission of an abortion. It is evident from this statement that the evidence was such as to carry these issues to the jury, and only the questions of law raised by the record need be reviewed.

I. On cross-examination plaintiff testified that she was acquainted with Ella Doheny, who was employed in the bank at Cumming of which defendant was cashier, also with Simon

1. BREACH OF MARRIAGE CONTRACT: evidence: cross-examination of plaintiff.

Casady, of Des Moines, and J. N. Casady, of Norwalk, who were interested in the bank as president and vice president, and was then asked, "Is it, or is it not, true that during the year 1911 you requested Simon Casady and J. N. Casady, or either of them, to discharge Mr. Glynn from the bank?" An objection as immaterial, irrelevant, incompetent, and not cross-examination was sustained. "Q. Is it true that you wrote a letter to either one of those gentlemen, Casady, and asking them in regard to the Doheny girl working in that bank, and in regard to Mr. Glynn working in that bank?" A like objection was sustained. Thereupon counsel for defendant stated that it was proposed to show that:

Plaintiff sought an interview with Simon Casady and J. N. Casady, they being officers of the bank in which defendant works, and at her solicitation at that time an interview was granted, and that the object of that interview was the discussion of matters between her and Mr. Glynn connected with this case, and that she in that interview some time in the month of June, I think the 22d of June, 1911, stated to the two Casadys that she thought the trouble with Glynn was the

—or words to that effect—was that he was under the influence
of this Ella Doheny; that she would be satisfied if they would
discharge the Doheny girl (this was the purpose of our
motion) from the employment of the bank, not file her peti-
tion, and not prosecute her case against Glynn; that after-
wards she wrote a letter we have, in which she said that she
was mistaken, and the relations existing between the Doheny
girl and the defendant were not what she thought they had
been, and now, if they would discharge Glynn, she would be
satisfied, and her petition would not be filed, and this case
would not be prosecuted; that subsequently on her own
motion she sought another interview, and said that she was
mistaken again, and that if they would agree to discharge the
Doheny girl (and this conversation occurred along after the
petition was filed) that she would be satisfied and not prose-
cute the case, or would dismiss it, or words to that effect. Now
the intention of this testimony is to show the animus of this
prosecution, to show her attitude, and to show the matter of
good faith as affecting her credibility as a witness in the case.
Court: The ruling will have to remain. The objection is
sustained.

We think the inquiries in view of the explanation fairly.
within the range of proper cross-examination. The evidence
sought to be elicited would have tended to show the animus
actuating her in the action and have borne more or less directly
on her credibility as a witness. As the trial court exercises a
large discretion in fixing the limit of cross-examination tend-
ing to disclose motive or interest, we might not have been
inclined to reverse on this ruling; but, as the matter concerned
the relations of the parties to the action, we think the evidence,
if offered on another trial, should be received.

II.   Plaintiff testified to having first discovered that she
was pregnant on November 8, 1906, and that she consulted Dr.
Sherman near the last of the month, and about two weeks
later he gave her medicine, and that he op-
erated on her to cause an abortion April,
1907, which resulted later. The doctor denied
all this, and testified that plaintiff never asked
him "to perform an abortion on her," but on objection was

2. SAME: evi-
dence: privi-
leged communi-
cations:
waiver.

not permitted to testify whether as early as August in 1906 she consulted him as to whether she was pregnant, or he examined her to ascertain this. The ruling was correct. By her testimony she had waived the privilege as to any consultation or examination had in December or about that time (*Woods v. Incorporated Town of Lisbon,* 150 Iowa, 433), but not as to more remote period, and, though the testimony called for may have been material, he was not at liberty to give it over her objection that the consultation was privileged.

III. The plaintiff testified that in April, 1907, Dr. Sherman gave her a paper of tablets, known in the record as Exhibit W. W., to be dissolved in water and used as a douche. The doctor denied having given her these in 1907, or to have given her the directions she had testified to, but stated that he gave them or similar ones to her in 1905, and on objection was not permitted to testify for what purpose they were then given, or whether they were to be used following an abortion. Assuming that he would have testified most favorably to defendant, he must have related a transaction which could have had no connection whatever with that of which she had spoken. Undoubtedly in testifying to receiving the tablets in April, 1907, and their purpose, she waived the right to insist on the protection of the statute excluding the physician's testimony concerning the same (*Woods v. Incorporated Town of Lisbon, supra*), but only as to matters concerning which she spoke. What the doctor may have done two years previous she did not allude to, and as to that his lips were sealed. The rule is said in 4 Wigmore on Evidence, section 2388, to be that: "A waiver is to be predicated not only when the conduct indicates a plain intention to abandon the privilege, but also when the conduct, though not evincing that intention, places the claimant in such a position with reference to the evidence that it would be unfair and inconsistent to permit the retention of the privilege. It is not to be both a sword and a shield."

For this reason, doubtless, the testimony of the doctor denying that he gave her the tablets in 1907, and stating that

they were given on another occasion two years previous, was received. What their purpose was then would throw no light on the transaction in 1907, and would tend to open up professional matters on which plaintiff had the right to have him remain silent. In *Treanor v. Railway* (Com. Pl.) 16 N. Y. Supp. 536, the testimony of the physician related to the precise matters concerning which the complainant had testified, and therefore the implied waiver related thereto and not to an independent transaction. The ruling was correct.

IV. A sister of plaintiff was asked, as was also her mother, in substance, "Whether or not it was understood by all members of your family that Mary was to be married to

3. SAME: evidence of marriage contract: conclusion.

Mr. Glynn?" and over objection as incompetent, irrelevant, and immaterial, "unless they got that understanding from Mr. Glynn, or what Mr. Glynn said to them," answered in the affirmative. Had this evidence been tendered solely as tending to establish an engagement to Mary, there would be much force in defendant's contention, for, though this may be proven "by unequivocal conduct of the parties, and by a general, yet definite and reciprocal, understanding between them, their friends and relations, and corroborated by their actions, that a marriage was to take place" (*Thurston v. Cavenor*, 8 Iowa, 155), this must be shown by what was done and said evidencing such understanding, not among friends and relatives, but between the alleged contracting parties and such friends and relatives as assumption in conversation of an engagement or that they were to become husband and wife, or otherwise recognizing the relationship. In measuring the damages to which she might be entitled to recover, the humiliation she endured because of breaking the engagement, and the wounding of her feelings thereby, were important elements, and the fact that the members of the family with whom she constantly associated knew of their relationship could but add to and accentuate the poignancy of her grief and mortification. For this reason, the knowledge of the members of the family may be shown.

*Reed v. Clark,* 47 Cal. 195; *Dunlap v. Clark,* 25 Ill. App. 573. Evidence that plaintiff had communicated to her family the fact of the engagement also has been received as tending to prove consent to or mutuality of the promise to marry. *Thurston v. Cavenor,* 8 Iowa, 155; *Lewis v. Tapman,* 90 Md. 294 (45 Atl. 459, 47 L. R. A. 385).

But in the eighth instruction the court told the jury that, in determining whether there was an agreement to marry, they might consider, among other things, "how the immediate relatives and friends of their respective families understood their relation toward each other." We have discovered no authority holding that proof of the understanding in the family of either party may be considered as evidence of an agreement to marry. Certainly *Thurston v. Cavenor, supra,* should not be construed as so holding. The point discussed was whether a modification concerning an admission by plaintiff should have been inserted in an instruction. That in the excerpt therefrom quoted above it was not intended to say the contract might be shown by the understanding of friends or relatives appears from the inapplicability of the citations following. In *Daniel v. Bowles,* 2 C. & P. 553, the evidence was of a conversation by defendant with the mother of plaintiff at one time and with the mother and daughter at another, and nothing will be found in Chitty on Contracts or Blackstone's Commentaries bearing on the question as to whether the understanding of the respective families may be proven. Even if what is said in *Thurston v. Cavenor* could be construed as so holding, it is mere dictum. To receive such evidence as tending to prove a contract would be going farther than admitting hearsay—it would be receiving testimony of a conclusion based on hearsay. The members of the family may have reached their understanding from what plaintiff had said in the absence of defendant, or have inferred as much from the long-continued attentions of defendant. And yet such attention, however long-continued, if without a proposal or promise of marriage, would not justify such a conclusion.

*Whitcomb v. Wolcott,* 21 Vt. 368. Of course, the bearing of the parties toward each other, what they may say when together in the presence of friends and relatives, always may be shown. *Russell v. Cowles,* 15 Gray (Mass.) 582 (77 Am. Dec. 391). "All the facts and circumstances existing between the parties prior to or after the time when the alleged marriage contract was entered into, tending to establish an engagement, must be regarded as proper evidence for the consideration of the jury." *Richmond v. Roberts,* 98 Ill. 472.

"The ordinary politeness and civility which a gentleman extends to a lady are not to be considered as furnishing any proof of such a promise. The safest rule which we can lay down is this: If you find that the attentions which the defendant paid the plaintiff, and the intercourse between them, were such as were usual with persons engaged to be married, and such as are unusual with persons between whom there exists no such relation, they are competent for you to consider as evidence which may or may not, as you may determine, suffice to prove a promise of marriage. It is not necessary for you to consider that there was an express promise made and accepted in terms; but if his conduct was such as to induce her to believe that he intended to marry her, and she acted upon that belief, the defendant permitting her to go on trusting that he would carry the intention into effect, that will raise a promise upon which she may recover. But this must be shown by facts and circumstances, and you cannot consider the understanding of the friends of the parties as to relation between them." *Perkins v. Hersey,* 1 R. I. 493. See, also, *Kelley v. Highfield,* 15 Or. 277 (14 Pac. 744); *Clark v. Hodges,* 65 Vt. 273 (26 Atl. 726); *Rutter v. Collins,* 96 Mich. 510 (56 N. W. 93); *Peppinger v. Low,* 6 N. J. Law, 384.

In *Leckey v. Bloser,* 24 Pa. 401, the ruling by which several witnesses were allowed to testify from the conduct of the parties whether a mutual attachment in their opinion existed, or only the relation of ordinary acquaintances and friends, was denounced as erroneous, saying: "On such a

subject the jury is as competent to weigh the facts and deduce the appropriate conclusions as the witness. And if the witness have no facts to describe to a jury, what are his conclusions and impressions but the baseless visions of his imagination? The question here was, Had Leckey promised to marry the plaintiff? There was no direct evidence of the promise; but it was competent for her to prove such attentions on his part as ordinarily characterize a matrimonial engagement, and as might lead a jury to presume a promise. The law has an open ear for the complaints of deserted innocence, and the tribunals of the law are quite ready enough to give full effect to such circumstantial evidence as is usually submitted in actions of this sort, to prove the promise of the recreant lover; but if he is to be charged with infidelity to his vows, not upon proved circumstances, but upon the surmises, suspicions, opinions, and the impression of witnesses, we shall be in great danger of producing more evils than we remedy, and of sacrificing the legal rights of a man to redress the imagined wrongs of a woman." And so the opinion of the witnesses in this case as to what members of the family understood, whether based upon the attentions paid plaintiff or other information, should have been excluded on the objection urged because calling for an opinion or conclusion of the witnesses, and the instruction was erroneous in allowing the consideration of the inference of third parties in determining the existence of a contract.

V. The court, in the ninth paragraph of the charge, said to the jury:

If you find from a preponderance of the testimony as hereinbefore defined to you that such marriage contract was entered into substantially as charged in plaintiff's petition, and that plaintiff is entitled to a recovery in this case, under these instructions, then it will be proper for you in estimating or determining the amount of her recovery to take into consideration her wounded feelings, humiliation, her loss of social standing, the amount and value of the defendant's property,

as indicating what she has a right to expect to enjoy from a consummation of said marriage, and all the other facts and circumstances disclosed upon the trial hereof, as tending to show what the plaintiff has lost by reason of the defendant's failure to perform said marriage contract, as alleged in her petition. And you should allow her such sum as, in your judgment, will make her whole for the injury she has sustained by reason of the breach of such contract.

And if you shall further find from the preponderance of the testimony that while the marriage contract was in existence and by reason thereof the defendant seduced the plaintiff; had sexual intercourse with her, and that he advised or procured an abortion to be performed upon her, then and in such case you will be entitled to consider, in estimating the amount of such recovery, her pain and suffering occasioned thereby, her mental anguish, humiliation, and shame, injury to health, if any has been shown, and any other injury that she sustained by reason thereof, as the same has developed upon the trial hereof.

If you should fail to find that plaintiff has established by a preponderance of the testimony that during the existence of the marriage contract and by reason thereof the defendant seduced the plaintiff, had sexual intercourse with her, and that an abortion or miscarriage was produced with the advice of the defendant, then you will not be entitled to consider such facts in estimating the amount of plaintiff's recovery, even though you find her entitled to recover.

No exception is taken to the first paragraph; but it is insisted that the last two are erroneous for that, as is said: (1) Abortion, and especially criminal abortion, ought not to be considered in aggravation of damages in an action for breach of promise; and (2) that physical pain and suffering because of pregnancy or childbirth, mature or premature, should not be taken into account in estimating damages in such a case. Assuming the action to have been for damages resulting from the breach of promise alone, can these be said to have been the natural consequence of such breach? Seduction, accomplished through the promise, may be shown on the theory

4. SAME: damages: evidence:

that the mental anguish and humiliation resulting from the breach will be intensified thereby. *Geiger v. Payne,* 102 Iowa, 581; *Herriman v. Layman,* 118 Iowa, 590. But some courts hold that, as seduction constitutes an independent cause of action, and the parties are *in pari delicto,* such proof is inadmissible. See *Weaver v. Bachert,* 2 Pac. 80 (44 Am. Dec. 159); *Burks v. Shain,* 2 Bibb (Ky.) 343 (5 Am. Dec. 616), and the dissenting opinion of Breese, J., in *Fidler v. McKinley,* 21 Ill. 308. Evidence of pregnancy resulting from seduction also is admissible, for the grief and humiliation of a woman occasioned by the breach in that situation necessarily would be greater than would be likely had not pregnancy followed. *Tyler v. Salley,* 82 Me. 128 (19 Atl. 107); *Sherman v. Rawson,* 102 Mass. 395; *Kelley v. Riley,* 106 Mass. 339 (8 Am. Rep. 336). But proof of the effect of pregnancy on bodily health is not admissible *(Tyler v. Salley, supra),* for that is a consequence of the physical condition, and in no sense of breaking the promise of marriage. The infirmities due to pregnancy and the physical suffering incident to childbirth necessarily must have been endured had the promise been consummated by marriage, and therefore cannot be attributed to the breach. In other words, there is no causal connection between such suffering and the refusal to keep the promise, and therefore it is not an element to be considered in measuring the damages to be allowed. Such a case is readily distinguished from an action for seduction, the natural consequences of which is pregnancy and the suffering incident to childbirth, both of which are elements of damages. *Stevenson v. Belknap,* 6 Iowa, 97; *Smith v. Milburn,* 17 Iowa, 30.

Because of the lack of causal connection, the fact that a miscarriage occurred or an abortion was committed may not be considered in aggravation of damages in an action for breach of promise. True, abortion may be shown in actions by the father for loss of services resulting from the seduction of a daughter; but such an action cannot be maintained unless

pregnancy results and sickness, with consequent loss of service, construed to include loss of the comfort and society of the daughter and the honor of the father and his family, and, if for his own protection against the original wrong the defendant subjects the daughter to another, corrupting her morals to an extreme degree, imperiling her health and life, and exposing her to a deeper disgrace, this but aggravates the original wrong by adding to the loss of service, which is the gist of the action. *Klopfer v. Bromme,* 26 Wis. 372; *White v. Murtland,* 71 Ill. 250 (22 Am. Rep. 101); *Beaudette v. Gagne,* 87 Me. 534 (33 Atl. 23).

But the perpetration of this offense, that is, of abortion, was as likely had there been no engagement, and if it occurred as an inducement to defendant to adhere to his agreement, as, some of the evidence tended to show, this was inconsistent with an inference that it was owing to a breach thereof. Moreover, according to the evidence, the abortion was committed long before the engagement was broken. The commission of an abortion is not the natural consequence of the breaking of an engagement to marry, and the evidence adduced did not tend to establish any causal connection between the two.

In *Giese v. Shultz,* 53 Wis. 462 (10 N. W. 598), the jury was directed that, "if . . . you should find that the defendant seduced the plaintiff under a promise of marriage, and got her with child, you will, in addition to the damages I have named, take into account this fact, and give such damages as she has sustained by reason of that additional injury," and the court in adjudging this erroneous, said:

Other elements of injury, such as loss of time, expenses of medical and other attendance, and the like, might be held proximate, and might therefore increase the damages, in an action of trespass *per quod servitium amisit,* in which the seduction of the servant is proved in aggravation of the damages. In that form of action the loss of service caused by the seduction is the primary cause of action, and, of course, such

loss is proximate. And the same may be said of the expenses which are the direct result of the act which caused the loss of service. But in this case the cause of action is further removed from the injuries just mentioned. The breach of the promise of marriage is the foundation of the action; the seduction is the result of such promise—perhaps proximate—although, but for the authorities, that might well be doubted; but the loss of service and expenses of sickness, which might or might not result from the seduction, are certainly not the proximate results of the breach of promise, although they may be of the seduction.

On another trial practically the same instruction was given, and from the second opinion, found in 65 Wis. 487 (27 N. W. 353), it appears there was a miscarriage, and the court held this improper for the consideration of the jury.

*Schmidt v. Durnham,* 46 Minn. 227 (49 N. W. 126), is not necessarily inconsistent therewith. In so far as the conversation of these parties concerning the commission of an abortion was connected with the promise of marriage or its performance, evidence thereof undoubtedly was admissible; but whether the crime was in fact perpetrated had no bearing on the issue, and neither the crime, if such there were, nor the suffering occasioned thereby was a consequence flowing from the breach of promise alleged. But see section 985, Sutherland on Damages.

As the petition was in one count, the court might well have construed it to claim such damages only as resulted from the breach of the contract to marry, and have treated the allegations concerning seduction and pregnancy as in aggravation of the damages consequent of the breach. *Geiger v. Payne,* 102 Iowa, 581. But in receiving evidence, and in giving this and other instructions, the court must have construed the petition as stating two causes of action, that of seduction, and breach of promise to marry. In actions for seduction, all the natural consequences, such as pregnancy, childbirth, sickness, and like matters, including abortion at the instance of the defend-

5. SAME: seduction: pleadings: damages: instruction.

aut, may be considered in estimating the compensation to be awarded plaintiff. *McCoy v. Trucks,* 121 Ind. 292 (23 N. E. 93); *Gunder v. Tibbits,* 153 Ind. 591 (55 N. E. 762); *Klopfer v. Bromme,* 26 Wis. 372; 4 Sutherland on Damages, section 1283; 35 Cyc. 1320.

Undoubtedly both causes of action could have been prosecuted in one action. for, under section 3470 of the Code, an unmarried woman may prosecute an action for her own seduction, and section 3545 of the Code provides that: ''Causes of action of whatever kind where each may be prosecuted by the same kind of proceedings, if held by the same party, and against the same party, in the same rights, and if action on all may be brought and tried in that county, may be joined in the same petition.'' See *Turner v. Bank,* 26 Iowa, 562; *Devin v. Walsh,* 108 Iowa, 428. Of course, each cause of action should have been stated in separate counts; but no objection was raised on this ground, though the circumstance that the facts which might have been pleaded in aggravation were included in the count alleging the breach strongly tended to define a purpose not to assert another cause of action. As the court seems to have ruled that both causes of action were alleged in the petition, and no prejudice resulted, we are not inclined to denounce the instruction as containing reversible error.

Because of the errors pointed out, the judgment is *Reversed.*