Mary A. Nolan, Appellee, v. Wm. H. Glynn et al., Appellants.

**FRAUDULENT CONVEYANCES: Grounds of Invalidity—Consideration—Good-Faith Purchase for Inadequate Price.** A creditor may not, even for the sole purpose of protecting himself, buy

the property of his insolvent debtor for less than its fair value, knowing that other creditors will thereby be defeated in collecting their claims. In such case, the conveyance will be deemed without consideration, and therefore fraudulent, to the extent of the difference between what he did pay and the value of the property.

WEAVER and SALINGER, JJ., dissent as to the extent of relief granted.

*Appeal from Warren District Court.*—W. H. FAHEY, Judge.

FRIDAY, FEBRUARY 18, 1916.

SUPPLEMENTAL OPINION ON REHEARING, TUESDAY, JUNE 26, 1917.

SUIT to subject land or its proceeds to the satisfaction of plaintiff's judgment resulted in a decree against defendant Casady, from which both defendants appeal. Afterwards, plaintiff perfected an appeal.—*Affirmed.*

*Berry & Watson* and *John A. Guiher,* for appellants.

*Robbins & Smith, A. W. Wilkinson* and *A. V. Proudfoot,* for appellee.

FRAUDULENT
CONVEYANCES:
grounds of invalidity: consideration:
good-faith purchase for inadequate price.

LADD, J.—An action was begun by plaintiff against defendant Glynn for damages consequent upon an alleged breach of promise of marriage, by serving the original notice April 15, 1911, and filing the petition August 23d following. Trial was had, and judgment for $8,000 entered against Glynn November 20, 1911, from which an appeal was taken. This judgment was reversed September 25, 1913. See 163 Iowa 146. Another trial was had, and judgment entered against Glynn for $7,500, April 15, 1914. The object of this action is to subject certain lands transferred by Glynn to his codefendant, Casady, to the satisfaction of this judgment. On December 11, 1912, after the entry of the first judgment, and prior to its reversal, Glynn and Casady entered into a written

contract, under the terms of which the latter purchased of the former a farm of about 131 acres in Warren County at $75 per acre, and a farm of 80 acres in Madison County, at $80 per acre, the entire consideration, $16,013.20, to be paid by immediately cancelling a note of Glynn's to Casady for $1,500, an existing mortgage on the Madison County land of $2,500, a mortgage on the Warren County land of $4,000, and a subsequent mortgage of $3,000 thereon, leaving a balance of $5,013.20 to be paid upon the delivery of the deeds by cancelling another note of $1,500 due Casady, and paying $3,513.20 in cash, Glynn to pay taxes of 1912. And it was "further understood that there is now a judgment against said Glynn in favor of Mary Nolan for $8,000, and the same is now pending in the Supreme Court of Iowa. If the same is affirmed by said court, the said Casady is then to pay the sum of $4,000 in to the clerk of court of Warren County, Iowa, being part of the $5,013.20 due said Glynn; so that the said Glynn may use the same to satisfy said judgment, the balance of said judgment the said Glynn will otherwise care for. In the event the said judgment is not affirmed, then the said Glynn agrees that the said Casady may deduct the sum of $1,500 and interest which is due him, as above set out, and the balance of the $5,013.-20 is to be paid by said Cassady to said Glynn in cash. It being understood that, in the event that the said court should not reach said case in the spring of 1913, and the same should go over to a later date, then the said Glynn agrees also to pay the 1913 taxes and interest on all mortgages to March 1, 1914, and the rent received for the year of 1913 is to go to said Glynn, and said Casady is to be allowed 7 per cent interest on the amount which he is compelled to pay in cash either to the clerk of court or to said Glynn, as the case may be, from the time payment is made until March 1, 1914."

Glynn was to furnish abstract showing merchantable

title, convey by warranty deed, subject only to the three mortgages, "said deed to be made within 30 days from the date hereof, and to be delivered as soon thereafter as said Casady is able to pay said money in the manner as above referred to." The farms were to be turned over in as good condition as at the date of the contract, wear and decay excepted. Separate deeds to the respective tracts of land were signed and acknowledged by Glynn January 15, 1913, and by him given to the recorder and recorded September 27th following, two days after the reversal of the judgment by the Supreme Court, and later delivered to Casady. None but the contracting parties was aware of the transaction at the time. Glynn continued in possession until March 1, 1914, when the second $1,500 note was cancelled, and Casady paid Glynn the balance of $3,256.65. Casady was cashier of the Norwalk State Bank, to which the second mortgage of $3,000 on the 131 acres was executed, after the beginning of the suit, and was part owner of the Cummings Bank, of which Glynn had been cashier for several years, and until 1914. Casady had been a witness for Glynn at both trials, and had been somewhat intimate with him in business matters. Glynn claims to have listed the farms for sale with several agents, about a year before selling to Casady, and in the fall of 1912, to have reduced the price to $90 per acre for the 80 acres, and $80 or $85 for the 131 acres. What his price had been is not disclosed by the record. He first spoke to Casady about selling to him either in August of that year, as stated by Glynn, or 30 to 60 days prior to making the contract, as said by Casady, and was advised by the latter to make further effort to sell to someone else. Glynn testified that his purpose in selling was to dispose of the land so as to avoid having it sold at forced sale, should the (first) judgment be affirmed. This may be true, for the judgment was a lien on one of the farms at least, and counsel for Casady assume in argu-

ment that it was a lien on the other farm also. If so, we fail to perceive on what theory counsel laud Glynn for undertaking to arrange payment of what might in any event be enforced against his property. He had appealed from the judgment, and the criticism of the transaction is not that defendants took into account what Glynn might be compelled to do in event of an affirmance, but that what they undertook in the contract to do, and carried out, was calculated to and did place Glynn's property beyond the reach of Mary Nolan in the collection of any judgment she might recover against him. The price was inadequate, as both of them well knew. Even after Glynn had reduced the price through his agents, that of the 80 acres was $10 above that named in the contract, and $5 or $10 per acre higher on the 131 acres. Within six months thereafter, June 9, 1913, Casady addressed a letter to Glynn, saying that he had concluded to sell the farms, and that he thought Glynn "might have an opportunity to sell them, as they are more handy for you to show than me. I want for the farm near Patterson $105 per acre, and for the other farm on the county line, I want $100 per acre, and I will allow you a commission of $2 per acre if you will furnish me a buyer for either one of these farms. I trust you will get busy, as I would like to dispose of them this season if I can. By the way, you are pretty well acquainted in Winterset and know the real estate men there better than I, and why would it not be a good idea for you to list it with someone there and work in connection with them in selling this farm, and you can make whatever division of the commission you wish? Now I trust you will give this attention and push the matter as I do not care to hold these farms but prefer to convert them into money. Of course I expect to show these farms and sell them myself if I get an opportunity."

Glynn, as directed, listed the farms with several

agents.    Witnesses disagree as to the value of the respective
farms at the time of the contract, the estimates on the Mad-
ison County farm varying from $80 to $125 per acre, and on
the Warren County farm from $65 to $110.   In view of the
prices put on them by Glynn before, and by both within
six months after entering into the contract, and the sale
of the Madison County farm in August, 1913, at $100 per
acre, we are of opinion that the finding of the district
court that the 80-acre farm was then fairly worth $100 per
acre, and the Warren County land, $90 per acre, ought not
to be disturbed.   Glynn at no time had demanded less
than $10 per acre more than named in the contract, and
even this was a reduction from the listing price.   Both
listed each farm shortly thereafter at $25 per acre in ad-
vance of the contract price, though values do not appear to
have increased, and one was sold, and all this before the
contract was to be performed.   When first approached,
Casady said he had all the land he desired, but evidently
the opportunity to buy the land for less than its value, and
thereby secure or collect the two $1,500 notes and the sec-
ond mortgage of $3,000 against the 131 acres owed to the
bank of which he was cashier, overcame his objections, and
he entered into the contract.   Both Casady and Glynn
strenuously deny that they entertained any purpose, when
entering into the contract, to defraud anyone; and, though
there is some evidence to the contrary, we are inclined, in
view of the fact that Glynn might well have done what he
did with the design to appropriate his property to the pay-
ment of Casady and other creditors, and that Casady may
have been influenced by the opportunity to collect for him-
self, to concur with the district court in according them the
benefit of the doubt.   Conceding, however, that there was
no such purpose, yet they purchased this land at $3,485, at
least, less than both seller and purchaser knew it was
worth, and with the knowledge on the part of both that

claims of other creditors, including that of plaintiff, would be left unpaid, and the debtor without property to satisfy them. A creditor, even though acting innocently, cannot be permitted to profit in this way to the detriment of unsecured creditors. *Cox v. Collis,* 109 Iowa 270; *Wiltse v. Flack,* 115 Iowa 51; *Griswold v. Szwanek,* (Neb.) 21 L. R. A. (N. S.) 222; *Keeder v. Murphy,* 43 Iowa 413. This is on the theory that the conveyances are fraudulent as to such excess, for to that extent, the insolvent has deeded his property without consideration, to the injury of his unsecured debtors. We have entertained not a little doubt as to whether defendant Casady did not participate in Glynn's effort and Glynn's act to place this property beyond the reach of plaintiff, but have resolved such doubt in favor of the finding of the trial court. We have no hesitancy, however, in reaching the conclusion that Casady ought to account for the difference between the inadequate price paid and the fair value.—*Affirmed.*

GAYNOR, C. J., DEEMER and SALINGER, JJ., concur.

## OPINION ON REHEARING.

SALINGER, J.—An opinion was filed in this case on February 18, 1916, which affirmed the action of the trial court. The plaintiff obtained a judgment against Glynn for $8,000. This judgment was reversed. See 163 Iowa 146. Another trial was had, and judgment entered against Glynn for $7,500. The object of this action is to subject certain lands transferred by Glynn to his codefendant, Casady, to the satisfaction of this judgment. The trial court declined to give plaintiff the full relief asked, but subjected the land to the extent of the difference between the price claimed to have been paid by Casady and what it found was the value of the land sought to be subjected. As said, we have affirmed this action. A rehearing was granted. We adhere to the foregoing opinion, but some of the members of the court would modify the judgment and decree below by sub-

jecting the lands to the full amount of plaintiff's judgment, with interest and costs.

It would be idle now to state in detail why this conclusion is now reached by some of us. Most of the reasons are found in said opinion last referred to. That sets out many badges of fraud, including the fact that the land was conveyed for a grossly inadequate price. The only thing that these judges add is that, upon what is found in said other opinion, the same·did not go far enough. The badges of fraud, including the inadequacy of consideration, seem to them to warrant more than the relief heretofore granted. That is to say, if they justify the relief granted below and affirmed before, they justify as well what these judges would do. It will not be amiss to point out in this connection that the former opinion lays no stress, for one thing, upon the fact that the trial judge, whose action we have heretofore fully affirmed, found that "defendant Glynn by these conveyances was attempting and intending to defraud plaintiff in the collection of her judgment."

They are not holding that there is any direct proof of actual fraud on the part of defendant Casady. The law recognizes that, when there is actual fraud, it will usually be·impossible to have direct proof of it. Recognizing this, it raises a conclusive presumption, if sufficient circumstances called badges of fraud are in evidence, that equity requires taking a conveyance out of the way of a creditor. They charge no one with actual guilt, but simply hold that such measure of proof has been furnished as that a court of equity must remove the conveyance as an obstacle to collecting a just debt.

The majority orders that the former opinion be adhered to.—*Affirmed*.

GAYNOR, C. J., EVANS, PRESTON and STEVENS, JJ., concur.

WEAVER and SALINGER, JJ., dissent.