BROWN *v.* ODILL.

*(Nashville.* February 24, 1900.)

1. BREACH OF PROMISE. *Validity of marriage contract.*

A marriage contract, to be consummated upon the death of the divorced wife of one of the parties, is not "void for indefiniteness and uncertainty." *(Post, pp. 251, 252.)*

2. SAME. *Same.*

A marriage contract is not void, as being in illegal restraint of marriage, by which two persons, duly qualified to make the contract, agree to marry each other, not at any specific or certain date, but upon the termination of the life of a specified third party. *(Post, p. 253.)*

3. SAME. *Same.*

A marriage contract is not void, as being "against public policy," which provides for its consummation upon the death of the divorced wife of one of the parties, the delay being "self-imposed and self-terminable at any moment," and stipulated on account of "religious scruples" of one of the parties. *(Post, pp. 253–255.)*

4. SAME. *What constitutes breach of.*

It constitutes a breach, for which immediate action lies, for a party to a marriage contract, to be consummated upon the death of his divorced wife, to enter into another marriage before the happening of that event. *(Post, pp. 255–260.)*

5. SAME. *Verdict not excessive.*

The verdict of $2,800 is not so large, in view of the facts set out in the opinion, as to indicate prejudice, passion, caprice, or corruption on the part of the jury. and cannot, therefore, be disturbed for alleged excessiveness. *(Post, pp. 264–266.)*

Cases cited: Goodall v. Thurman, 1 Head, 216; Tenn. Coal, etc., Co. *v.* Roddy, 85 Tenn., 400; Jenkins *v.* Hankins, 98 Tenn., 545.

6. EVIDENCE.   *Contradictory statements properly excluded.*

It is not error for the Court to refuse to permit a witness to be interrogated as to matters of mere hearsay as basis for his contradiction.   But if the witness should be permitted to answer questions of this character, his answers should be conclusive, as relating to collateral matters, upon the party calling for them, and not subject to contradiction.   (*Post, pp. 262–264.*)

Case cited: Saunders v. Street Railroad Co., 99 Tenn., 131.

FROM  MAURY.

Appeal in error from Circuit Court of Maury County.   SAM HOLDING, J.

WM. S. FLEMING and FIGUERS & PADGETT for Brown.

E. H. HATCHER and W. E. GREENLAW for Odill.

CALDWELL, J.   William Hugh Brown prosecutes this appeal in error from a judgment for $2,800, obtained against him by Miss Sarah Alberta Odill for the alleged breach of a contract of marriage.

The plaintiff averred in her declaration that on January 2, 1894, she and the defendant entered into a contract to marry each other on the 18th day of the same month and year; that before the latter day arrived, at the solicitation of the defendant, who had a divorced wife still living, and on account of religious scruples on his part,

they postponed the marriage until that divorced
wife, whom he represented to be in very bad
health, and not long to live, should die; that
during the continuation of their agreement to marry
upon the death of his divorced wife, and while
she still survived, the defendant, on December 19,
1897, married another woman, and avowed that
he would never marry the plaintiff.

The defendant assigned three grounds of de-
murrer: (1) That the contract averred "is void
for indefiniteness and uncertainty;" (2) that it
is void because "in restraint of marriage;" and
(3) that it is void because "against public policy."

The Circuit Judge overruled ·the demurrer *in
toto,* and his action in so doing is assigned as
error.

This Court deems no objection raised by the
demurrer tenable in any particular. In the first
place the contract as averred is entirely definite,
and absolutely certain in every element and part,
except as to the time of consummation, and that
is reasonably definite and certain since it is made
to depend upon an event which in the course
of nature must inevitably occur. It · is true that one
or both of the contracting parties might die in
advance of that event, but the same would be true
if the marriage had been set for the first day
of the next month, or of the next year; and in
neither case would that possibility render the con-
tract "void for indefiniteness and uncertainty."

In the next place the contract is in favor of marriage rather than in restraint of it. It bound the plaintiff and the defendant mutually to marry each other. In that respect it. was positive and absolute. Of course its terms were intended to restrain her from marriage with any other man, and him from marriage with any other woman; but that is not restraint of marriage in the legal sense, otherwise there could be no lawful marriage contract between any man and woman, because it would restrain each of them from marrying some one else. Nor is it material in this aspect of the contract that it did not designate a particular or specific day for the performance of the marriage ceremony.

The third assignment of demurrer, though not specifying any reason for the assertion therein that the contract is "against public policy," was no doubt intended to advance the proposition that it was subject to that objection, because its ultimate consummation was by its terms made to depend upon and to follow the death of the defendant's divorced wife, and in that way to hold out an inducement to the destruction of her life.

At first view there is seeming force in the proposition; yet the Court, after mature consideration, does not regard it as sound in law. There was in reality no legal impediment in the way of the marriage, and both parties were cognizant of that fact. Only "religious scruples" prevented

an immediate or early consummation; and it can hardly be conceived that persons actuated by so high a motive could be tempted to end the postponement by committing murder. The agreed delay, self-imposed and self-terminable at any moment, as it was, cannot properly be said to imply illegality of purpose, or to afford an inducement to crime.

A promise of marriage, to be fulfilled on the death of the defendant's father, was recognized as a valid contract by Lord Chief Baron Kelly in the case of *Frost* v. *Knight,* 5 L. R., Exch. Cases, 322, and later by Lord Chief Justice Cockburn in the same case, reported in 7 L. R. Exch. Cases, 111.

A note in 4 Am. & Eng. Enc. L. (2d ed.), p. 889, refers to a case of same style as reported in 41 L. J. Exch.; 78, and holding such a contract to be good.

The very much earlier case of *Woodhouse* v. *Shepley,* 2 Atkyn, 535, cited for the present defendant, is not in point here. There the woman, Hannah Woodhouse, and the man, Ralph Shepley, had become engaged to marry without the knowledge and over the opposition of her father, and executed each to the other a bond in the penalty of $600, and with condition that each should marry the other within thirteen months after the death of her father. When thirteen months after the death of the father had expired, the woman

filed her original bill to be relieved against her bond, and the man brought his cross bill to enforce the penalty. In disposing of the case Lord Chancellor Hardwicke said: "I am therefore of opinion that on the original bill the plaintiff ought to be relieved; and I say the same in this case as Lord Cooper did in *Floyer* v. *Lawington,* 1 P. Wms., 268, that though none of these circumstances singly might be sufficient to overturn this bond, yet, altogether they are so; but the chief of these, and which has great weight with me, is the encouragement this might give to disobedience, and the fraud on parents." 2 Atkyn, 540. That was not a suit upon the marriage contract itself, as was the case of *Frost* v. *Knight,* supra; nor was the supposed inducement to take the intervening life even suggested by Lord Hardwicke as one of the several circumstances upon which, as a whole, the judgment was rested.

After his demurrer had been overruled, the defendant filed pleas, in which he averred that the second 'agreement between the plaintiff and himself was a cancellation of their engagement, and not simply a postponement of the time for their marriage, as averred in the declaration.

The fact of the original marriage contract between these parties was conceded in the proof, as were the defendant's marriage to Dora Bunch, his present wife, and the continuing life of his divorced wife; and the principal controversy be-

fore the jury was whether that contract had been actually canceled, as the defendant averred and testified, or only its fulfillment postponed, as the plaintiff averred and testified. There was no proof to sustain the averment of the declaration that the defendant had formally declared his purpose never to marry the plaintiff, nor that he had done or said anything that could be construed as a breach of the alleged contract to marry her upon the death of his divorced wife, unless his intermarriage with his present wife should be considered such a breach.

In a request for special instruction, as well as in his motion in arrest of judgment, the defendant advanced the proposition that the contract, if found to be that he had agreed to marry the plaintiff after the death of his divorced wife, was not breached by his marriage to Nora Bunch, and his present conjugal relations with her during the lifetime of that divorced wife and while she still survives; and the Court's refusal to give that instruction and grant that motion is made the ground of the next assignment of error.

The substance of the contention made for the defendant on this assignment is, that the time for the fulfillment of his alleged promise to marry the plaintiff has not yet arrived, because his divorced wife is still living, and that it cannot be foreseen, and should not be adjudged in advance of her death, that he will not, when that event

shall occur, have been released by death or other-
wise from his alliance with his present wife, and
then be ready to fulfill both the letter and spirit
of the alleged contract with the plaintiff by in-
termarriage with her.

To say the least of it, the contention possesses
the merit not only of novelty but of apparent
plausibility as well. It is clear and incontroverti-
ble that the time for the performance of the con-
tract averred has not yet come, and it is pos-
sible that the defendant will be ready and able
to perform it lawfully, and according to its terms,
when that time does come.

It has been held that a testamentary provision
for a son, to be born to either of two designated
girls through her future marriage into either of
two designated families, is not defeated, nor the
gift over perfected by their marriage into other
families, because it is possible, nevertheless, that
one of them may yet marry into one of the
designated families and have a son as the fruit
of that marriage. *Randall* v. *Payne,* 1 B. C.
C., 55, cited in 2 Jarman on Wills (R. & T.
ed.), 511, 512.

But the possibility of the defendant's readiness
and ability to marry the plaintiff, as she avers
he agreed to do, upon the death of his divorced
wife, is not a sufficient answer in law to the
averment that he breached that contract by marry-
ing another person. His contract to marry the
20 p—17

Brown *v.* Odill.

plaintiff, as she averred and as the jury found, contemplated that he should marry no one else before her, and his marriage with another, though in advance of the time he was to marry the plaintiff, was in law a plain breach of that contract. It was in legal contemplation an unqualified renunciation of his contract with plaintiff, and absolutely terminated their engagement. He cannot occupy the relation of lawful husband to his present wife and at the same time defend this suit upon the ground that his previous promise to marry the plaintiff remains unbreached.

A promise of marriage, whenever to be consummated, cannot validly subsist after one of the parties has intermarried with a third person. The two things are utterly inconsistent and antagonistic, and the Courts will indulge no presumption in favor of a divorce or against the life of the preferred person for the purpose of discovering a possibility that the unfaithful one may yet be ready and able to marry the other person also when the deferred time shall arrive.

The defendant, in the same request for special instruction, properly conceded that a positive declaration on his part that he would never marry the plaintiff, if made, would have breached the contract averred by her, and afforded her a right of action thereunder, notwithstanding the fact that the time for fulfillment has not come; and yet, such a declaration could not be a more effective

Brown *v.* Odill.

and conclusive renunciation of his promise than was his intermarriage with another person. Indeed, the possibility of readiness and ability to perform the contract at the appointed time (if that possibility were considered of any legal consequence, as it is not) is much greater in the former than in the latter condition; for it is more reasonable, by far, to suppose that a person who has simply declared a purpose not to keep his promise of marriage to one woman, will relent and still offer to keep it, than it is to suppose that after marrying another he will by her death or divorce be released from the relation with her, and thereafter fulfill his promise with the former at the time previously designated.

In the English case of *Frost* v. *Knight,* already cited, it appeared that the parties contracted to marry each other upon the death of the man's father, and that before that event occurred the man declared that he would never marry the woman. Thereupon she sued him, while his father remained in life, averring that declaration as a breach of the contract.

She obtained a judgment in the lower Court, but it was arrested in the Court of Exchequer by the opinion of Lord Chief Baron Kelly, upon the ground that the defendant's father had not died, and that the defendant might still marry the plaintiff upon the death of his father, not-

withstanding he had declared that he would never marry her. 5 L. R., Exch. Cases, 322, 336.

The latter holding was reversed on writ of error, and the original judgment restored and affirmed by the opinion of Lord Chief Justice Cockburn, upon the ground that the defendant's declaration was an absolute breach of his contract, and gave the plaintiff an immediate right of action for damages. 7 L. R., Exch. Cases, 111. For a stronger reason would the marriage of the defendant to another person before the death of his father have been a renunciation and breach of his promise to the plaintiff, and afforded her an immediate right of action for appropriate damages.

It results, therefore, that the trial Judge ruled rightly in refusing to instruct the jury that the marriage of the defendant to his present wife in the lifetime of his divorced wife could not be a breach of his alleged promise to marry the plaintiff when his divorced wife should die, and in refusing to arrest the judgment upon the ground that the divorced wife is still living.

The charge, delivered correctly, announced the proposition that the promise of the defendant to marry the plaintiff on the death of his divorced wife, if made as averred by the plaintiff, was effectually broken by his conceded marriage to another woman, though that divorced wife still survived.

The assignments against the Court's declination

Brown *v.* Odill.

to grant requests for special instruction, relative to the burden of proof and the measure of damages, are sufficiently answered by the statement that the general charge delivered was accurate, and amply full on those subjects. When the two parts of the charge bearing upon the former subject are considered together, as the universal rule of practice requires they should · be, it is unmistakably clear that the jury was therein told that the burden was upon the plaintiff to show by a preponderance of the evidence that the time for the marriage between her and the defendant was postponed by mutual consent until after the death of his divorced wife; and such was the effect of the special instruction requested on that subject. The charge as to the measure of damages enumerated only the proper elements of compensatory damages in such a case, and directed that if the jury should find for the plaintiff it should "assess her damages at such an amount as will compensate her for the injuries received."

This part of the charge was self-restrictive, and it plainly limited the consideration of the jury to the elements of compensatory damages, and precluded the inclusion of exemplary damages; hence, it would have been superfluous to have charged additionally, as requested, that the "plaintiff would be entitled to only compensatory and not exemplary damages."

When the engagement between these parties was

first made, and the time for the consummation fixed at a future day in the same month, the plaintiff's parents were called into the parlor and the matter laid before them for their approval, which they gave. Neither of them was present, however, when the plan was changed and the second agreement entered into, the mother being in another room of the house, and the father having just gone to service at the church, of which all of them were exemplary members.

After the plaintiff had testified before the jury, her father was examined as a witness in her behalf. In his testimony in chief he stated the facts just recited, and some others, the most material of the latter being that the defendant told him, about three weeks after the change of plan, that the marriage had been postponed by mutual agreement between himself and the plaintiff. On cross-examination he was asked if he did not know that the engagement was broken off by mutual consent, and he replied that he did not, but that he learned from his "family," from the defendant, and "indirectly" from the plaintiff, that the marriage had been postponed.

He was further asked if he did not, a few days after the alleged postponement, visit their pastor, and then tell him that the engagement had been broken off.

Upon the plaintiff's insistence that the question was immaterial and incompetent, and that the de-

fendant would be bound by the answer, and could not be allowed to contradict it, the Court refused to permit the witness to answer in the presence of the jury. He did answer in the absence of the jury, however, that he did not tell the pastor that the marriage "had been broken off," but did tell him "that the case had been continued." In the further progress of the trial the defendant put the pastor on the stand, and offered his testimony to the effect that the plaintiff's father did tell him complainingly, at the time and place mentioned, that he, the pastor, had "broken up the marriage;" but the offer was refused on the objection of the plaintiff.

The defendant insists that the question put to the plaintiff's father was competent as laying proper ground for impeachment, and that his answer, and its contradiction by the pastor, should have been allowed to go to the jury; and the Court's ruling to the contrary is assigned as error.

The ruling was obviously correct. The plaintiff's father had testified that he had never at any time heard her say whether the marriage had been broken off or only postponed, but that he had learned from her "indirectly," and from the other members of his "family," that it had been postponed. He had no other source of information on the subject, and knew nothing about it at the time of the interview with the pastor, except what he had so learned by hearsay; his

conversation with the defendant, in which the latter was said to have stated that a postponement was made, not having occurred for a week or two after that interview.

It is manifest, therefore, that whatever the plaintiff's father may have said to the pastor, at the time and on the subject mentioned in the question, could, at most, have been only the expression of his opinion or conclusion from what he had heard third parties say; that such an opinion or conclusion, not being that of an expert upon a proper subject for expert testimony, was collateral to the real issue, and inadmissible as original evidence for either party; and, that being so, it could not properly be made the basis for impeaching the witness, but his answer in respect thereto, if permitted, would have been conclusive upon the defendant who called for it. *Saunders v. City & Suburban Railroad Co.,* 99 Tenn., 131, and citations.

For the same and kindred reasons other like rulings as to the testimony of the same and other witnesses, including the plaintiff's mother, are likewise approved, and the assignments against them held not to be good.

The assignment that "there is no credible proof to sustain the verdict," is bad in form, because it is the exclusive province of the jury to pass upon the credibility of witnesses; and it is not sustainable in fact with the word "credible" dis-

regarded, because there is not only some evidence to support the verdict, as required by the rule, but there is much evidence in its favor, the plaintiff having testified positively and consistently to the postponement of the marriage as averred in the declaration, and to several subsequent facts indicating a continuance of the engagement, and other witnesses having corroborated her testimony in regard to those subsequent facts.

The final objection is that the verdict, being for $2,800, is excessive.

There is no circumstance of aggravation in the case. Both parties were of excellent character and standing when they became engaged, and they are still so.

At that time the defendant told the plaintiff that his estate was worth ten thousand dollars, and it was so reported in the neighborhood, but he now says that he was mistaken in his estimate, and that in fact he was then, and is now, worth much less than that.

She seems to have no estate of her own, and her father is in very humble circumstances.

Among the principal elements of damage, rightly to be considered by the jury in making up the amount of the verdict, after that point had been reached, were the disappointment of the plaintiff's reasonable expectations of social, domestic, and material advantage to be derived from the promised marriage, the injury to her prospects in life, the

wounds to her affections, her mental anguish and mortification, resulting from. the defendant's wrongful breach of the contract. When all of these are taken into account, this Court cannot say that the amount of the verdict is too great. Certainly it is not so large as to indicate prejudice, passion, caprice, or corruption on the part of the jury, and not being of that magnitude, it cannot be set aside for excessiveness. *Goodall* v. *Thurman,* 1 Head, 216; *Tennessee Coal & Railroad Co.* v. *Roddy,* 85 Tenn., 400; *Jenkins* v. *Hawkins,* 98 Tenn., 545.

Let the judgment be affirmed.