IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2000 Session

## DAVID RIVKIN v. LORI POSTAL

**Appeal from the Chancery Court for Williamson County**
**No. 24930     Russ Heldman, Judge**

---

**No. M1999-01947-COA-R3-CV - Filed September 14, 2001**

---

This appeal involves the financial aftermath of a short-lived nonmarital affair that ended badly. The man filed suit in the Chancery Court for Williamson County seeking a partition of the jointly-owned property and the return of his personal property. The woman responded with a counterclaim for breach of promise to marry. Following a bench trial, the trial court divided the jointly-owned property and awarded the woman $150,000 in damages on her breach of promise claim. Both parties now take issue with the judgment. The man asserts that the evidence does not support awarding the woman $150,000 or granting the woman such a large share of the jointly-owned property. The woman takes issue with the reduction of her share of the property because of damage to the man's personal property while it was in her possession. We have determined that the evidence does not support the trial court's conclusion that a promise to marry existed or that the woman was damaged by the failure of the marriage to take place. We have also determined that, with the exception of a cedar chest belonging to the man's grandmother, the manner in which the trial court divided the parties' jointly-owned property was proper.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part & Reversed in Part**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Mary Arline Evans and John Michael Garrett, Nashville, Tennessee, for the appellant, David Rivkin.

Grayson Smith Cannon, Goodlettsville, Tennessee, for the appellee, Lori Postal.

### OPINION

### I.

David Rivkin and Lori Postal met in April 1994 at a music convention in Memphis. Mr. Rivkin was a successful, award-winning producer. Ms. Postal was a 28-year-old divorcée who was living in Atlanta with her mother and stepfather. She sold bathing suits at wholesale and had also

started a record label. Ms. Postal was attending the Memphis convention to obtain a record contract for a singer and a band that she represented. Even though Ms. Postal knew that Mr. Rivkin was married and had three children,[1] she welcomed his romantic advances. Within a short period of time, they began living together at the Peabody Hotel in Memphis and later moved into a house Mr. Rivkin bought in a Memphis suburb.

In early 1995, Ms. Postal discovered she was pregnant with Mr. Rivkin's child. Mr. Rivkin suggested an abortion, but Ms. Postal did not agree. Their child was born in September 1995. Shortly after their child was born, Mr. Rivkin sold the house in Memphis, and the parties moved to Williamson County because they believed that Mr. Rivkin would have greater success as a producer in the Nashville area. Mr. Rivkin was the parties' sole source of support, and he was able to provide an exceptionally affluent lifestyle for Ms. Postal and their child despite his continuing obligations to his wife and children. He purchased a $420,000 home in Williamson County and horses for Ms. Postal. He also hired a nanny for the child. Not surprisingly, Ms. Postal took to this lifestyle. She did not work outside the home but rather spent her time raising the parties' child, training her horses, and entertaining her personal friends and Mr. Rivkin's business associates.

But all was not well with the parties. They entered counseling in an effort to save their relationship. One of their problems stemmed from Ms. Postal's concern that her family knew that she was living with a married man and had given birth to his child. She insisted that Mr. Rivkin buy her an engagement ring to enable her to save face with her family. When Mr. Rivkin did not purchase a ring for her, Ms. Postal ordered a ring herself. Mr. Rivkin eventually paid for the ring after Ms. Postal refused to return it and also permitted her to wear it in front of her family. Ms Postal told her parents that she and Mr. Rivkin were planning to wed after he was divorced, and Mr. Rivkin did not contradict her. However, the parties themselves never discussed specific wedding plans.

The parties' relationship had disintegrated further by August 1996. Ms. Postal accused Mr. Rivkin of sexually molesting their child, and the Williamson County Juvenile Court, at the insistence of the Department of Human Services, ordered Mr. Rivkin to move out of the house and to stay away from the child while the Department conducted its investigation. Despite her charges against Mr. Rivkin, Ms. Postal continued to have sexual relations with him. Although Mr. Rivkin was eventually cleared of all the molestation charges, Ms. Postal's allegations irretrievably damaged the parties' relationship.

Mr. Rivkin was finally divorced from his wife in March 1997. However, by this time, Mr. Rivkin was no longer living in the parties' house. He saw Ms. Postal on occasion and continued to pay for all her living expenses, the mortgage on the house, the payments on her truck, and all of the child's expenses. One of their last meetings was Ms. Postal's birthday in May 1997. On this

---

[1]Mr. Rivkin had married Maryen Cukier Rivkin in March 1977. He and Ms. Rivkin had separated in June 1993.

occasion, Mr. Rivkin asked Ms. Postal to return the "engagement" ring and to begin paying some of her living expenses.  Ms. Postal returned the ring, and approximately one month later, Mr. Rivkin told her that their relationship was over and that he no longer wished to see her.

When it became evident that their relationship had ended, neither party followed Emily Post's sage advice "to take the high road – and move on."[2]  In September 1997, Mr. Rivkin filed suit in the Chancery Court for Williamson County seeking a partition of the parties' jointly-owned property and the return of his personal property that was still in Ms. Postal's possession.  Ms. Postal responded with a counterclaim seeking damages for breach of promise to marry.  As a result of this litigation, Mr. Rivkin stopped paying Ms. Postal's living expenses and the mortgage on the house. Ms. Postal was required to borrow money from her mother and father in order to stave off foreclosure.  Eventually, the parties agreed to sell the house and to place the proceeds in escrow. Before the case came to trial, Ms. Postal's father attempted to intervene in the lawsuit to recover the money he had loaned his daughter.

The trial court heard the case without a jury in November 1998.  In April 1999, the trial court filed a memorandum concluding that Mr. Rivkin had breached his promise to marry Ms. Postal and that Ms. Postal was entitled to $150,000 in damages.  The trial court awarded the parties equal shares of the remaining proceeds from the sale of the house and divided the other pieces of personal property generally according to schedules submitted by the parties, except for Mr. Rivkin's grandmother's cedar chest which was awarded to Ms. Postal.  The court also reduced Ms. Postal's award by $2,000, representing the damage to Mr. Rivkin's gold and platinum records that had been in her possession, and dismissed Ms. Postal's father's motion to intervene.

Both parties filed Tenn. R. Civ. P. 59.04 motions asking the trial court to address the 1993 GMC truck that had been overlooked in the memorandum opinion and judgment.  The trial court filed an order in August 1999 awarding the truck to Ms. Postal, and then vacated and re-entered the order in October 1999 because neither of the parties had received its August 1999 order.  On this appeal, Mr. Rivkin takes issue with the $150,000 damage award and the division of the jointly-owned property.  Ms. Postal takes issue with the trial court's decision to deduct $2,000 from her judgment because of the damage to Mr. Rivkin's gold and platinum records.

## II.

Thomas Hardy offended the Victorian opinionmakers of his day by suggesting in his 1896 novel *Jude the Obscure* that marriage was merely a contract that some persons entered into as unwisely as they entered into other contracts.  Many persons, other than clerics and literary critics, sensed that Hardy had a point.  Less than three-quarters of a century after the publication of *Jude the Obscure* in book form, much of the polite squeamishness over Hardy's suggestion had evaporated,

---

[2]Emily Post, *Emily Post's Wedding Etiquette* 12 (Peggy Post ed., 4th ed. 2001).

and even the courts were openly characterizing marriage as a contract. *See*, *e.g.*, *Jambrone v. David*, 156 N.E.2d 569, 571 (Ill. 1959); *Diemer v. Diemer*, 203 N.Y.S.2d 829, 834 (N.Y. 1960).

Though some may still object to characterizing marriage as a contract, promises to marry have been enforceable as contracts well before Hardy wrote about Jude Fawley and Susanna Bridehead. *See* 1 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 1.1 (2d ed. 1987) ("Clark") (discussing the history of breach of promise to marry). The contract to marry has been described as "essentially different from every other contract known to the law." *Lewis v. Tapman*, 45 A. 459, 461 (Md. 1900). Some courts have said that it "stands on a different footing from the general commercial contract." *Minsky v. Satenstein*, 143 A. 512, 514 (N.J. 1928). Professor Williston points out that while ordinary contract principles "find special and peculiar applications" to contracts to marry, such executory mutual promises are nevertheless subject for the most part to the rules governing any other bilateral contract. 10 Samuel Williston, *Treatise on the Law of Contracts* § 1289 (Walter H. Jaeger ed., 3d ed. 1967). As far as contracts go, one is just as binding as the other. *Attridge v. Pembroke*, 256 N.Y.S. 257, 260 (App. Div. 1932).

In England, before the founding of this country, questions touching on marriage and breach of a promise of marriage were chiefly the province of the ecclesiastical courts. *Lewis v. Tapman*, 45 A. at 460; Lawrence M. Friedman, *A History of American Law* 202 (2d ed. 1985). Those courts, however, lacked power to grant relief in breach of promise to marry cases other than to decree a performance of the marriage on pain of spiritual punishment. Eventually, as marriage began to be viewed as "largely a property transaction, entered into as much for material advantages as for reasons of sentiment,"[3] actions for breach of promise to marry found their way into the King's courts where the aggrieved parties could obtain what they actually wanted – money damages. *Lewis v. Tapman*, 45 A. at 460.

The common-law action for breach of promise to marry made its way to the American colonies along with most of the common law of England. Here, it started out as "a popular means of soothing the sufferings of rejected love."[4] In time, however, it became subject to abuse. Borrowing ideas from tort law, the courts began permitting juries to award punitive damages. Note, *Heartbalm Statutes and Deceit Actions*, 83 Mich. L. Rev. 1770, 1773-74 (1985); Comment, *California Reopens the "Heartbalm" Action*, 9 Stan. L. Rev. 406, 408 (1957). Most breach of promise to marry actions were brought by women against men,[5] and men's fears of excessive verdicts and their distaste for the scandal surrounding such suits gave women the power to wield the cause of action almost as blackmail. 1 Clark § 1.1; Note, *Heartbalm Statutes and Deceit Actions*, 83 Mich. L. Rev. at 1776-77.

---

[3] 1 Clark § 1.1.

[4] 1 Clark § 1.1.

[5] *See*, *e.g.*, *Poster v. Andrews*, 182 Tenn. 671, 189 S.W.2d 580 (1943); *Goodner v. Goodner*, 147 Tenn. 517, 249 S.W. 805 (1923); *Brown v. Odill*, 104 Tenn. 250, 56 S.W. 840 (1900).

By the 1930s, newspapers were publishing accounts of "spectacular 'extortion and blackmail rackets'" based on these claims. William B. Eldridge, *Domestic Relations – Breach of Promise Actions*, 21 Tenn. L. Rev. 451, 451 (1950) ("Eldridge"). The publicity of the "unfounded suits, perjury, and excessive verdicts at the hands of . . . seemingly ever gullible . . . [juries] armed with unrestrained discretion" eventually prompted a movement to reform these claims. Eldridge, 21 Tenn. L. Rev. at 452. Beginning with Indiana in 1935, the states began enacting statutes aimed at ending the perceived abuses associated with breach of promise claims. 1 Clark § 1.1; Note, *Heartbalm Statutes and Deceit Actions*, 83 Mich. L. Rev. at 1770-71; Comment, *California Reopens the "Heartbalm" Action*, 9 Stan. L. Rev. at 408.

Many states abolished the cause of action altogether, prompting courts to jump on a bandwagon of sorts that some thought went too far. It became increasingly evident that the pendulum was swinging too far in the other direction. The barriers erected to correct one evil gave legal protection to another. The courts, perhaps overzealous in their interpretation of legislative intent, construed these statutes as prohibiting tort actions between formerly betrothed parties for fraud and deceit . . . .[6] Eldridge, 21 Tenn. L. Rev. at 452.

Tennessee chose a middle course. Rather than abolish the common-law cause of action for breach of promise to marry, this state chose to rein it in a bit. In 1949, the Tennessee General Assembly passed an act which, according to its caption, was designed "to prevent certain injustices in suits for damages for the breach of promise or contract of marriage."[7] This act circumscribes breach of promise claims in four significant ways. First, Tenn. Code Ann. § 36-3-405 provides that these claims could not be joined with other damage claims. Second, Tenn. Code Ann. § 36-3-401 requires that promises or contracts of marriage could only be established using either signed, written evidence of the promise or contract or the testimony of at least two disinterested witnesses. Third, Tenn. Code Ann. § 36-3-403 requires juries to consider the parties' age and experience in calculating damages.[8] Finally, Tenn. Code Ann. § 36-3-404 prohibits awarding punitive damages in cases where the alleged breaching party was over sixty years old. These statutes survive to the present day, and thus this case is governed by their strictures.

### III.
#### EVIDENCE OF THE CONTRACT OR PROMISE TO MARRY

---

[6]Deceit actions for damages resulting from a fraudulent promise to marry have as their object compensating a party for expenditures made in reliance on the deceitful promise. Note, *Heartbalm Statutes and Deceit Actions*, 83 Mich. L. Rev. at 1772 n.10.

[7]Act of April 8, 1949, ch. 161, 1949 Tenn. Pub. Acts 486, now codified at Tenn. Code Ann. §§ 36-3-401, -405 (1996).

[8]In fact, Tenn. Code Ann. § 36-3-403 specifically provided that "[a]ny previous marriage on the part of such plaintiff shall be considered by the court and jury in mitigation of the damages that might otherwise be allowed."

A suit for breach of promise or contract to marry follows the procedures generally associated with other actions for breach of contract. *Kaufman v. Fye*, 99 Tenn. 145, 167, 42 S.W. 25, 30 (1897). Thus, the plaintiff has the burden of proving the existence of a contract, that is an offer of marriage and an acceptance, along with consideration (which need only be a return promise to marry). *Weeks v. Mays*, 87 Tenn. 442, 443, 10 S.W. 771, 771-72 (1889); *Conn v. Wilson*, 2 Tenn. (2 Overt.) 234, 234 (1814); Clark § 1.2, at 6. The plaintiff must also prove the other party's refusal to marry or the disavowal of intent to perform. *Crossett v. Brackett*, 105 A. 5, 6 (N.H. 1918).

Ms. Postal's testimony alone is insufficient to prove the existence of a promise or contract to marry. Tenn. Code Ann. § 36-3-402. To meet her burden of proof in this case, Tenn. Code Ann. § 36-3-401 requires her to present either "written evidence of such contract, signed by the party against whom the action is brought" or with the testimony of "at least two disinterested witnesses." As best we can determine, the trial court concluded that Ms. Postal presented evidence of both sorts. We have concluded that the trial court erred on both counts.

## A.
## Written Evidence of a Contact or Agreement to Marry

We turn first to the "written evidence." In March 1996, one month after he purchased the Williamson County house, Mr. Rivkin executed a quitclaim deed conveying the property to himself and Ms. Postal as joint tenants with right of survivorship. The trial court appears to have decided that this quitclaim deed is the sort of written evidence that Tenn. Code Ann. § 36-3-401 requires.[9] The quitclaim deed, however, falls far short of the mark.

We presume that the Tennessee General Assembly intended to make a useful contribution to the law governing breach of promise to marry cases when it enacted Tenn. Code Ann. § 36-3-401. Accordingly, the statute must contemplate that any writing proffered to satisfy Tenn. Code Ann. § 36-3-401 must have real probative force with regard to the existence of both an offer to marry and an acceptance. The writing must, in the language of Tenn. R. Evid. 401, make the existence of Mr. Rivkin's promise to marry more probable than it would be without the evidence.

"It is obvious," as one treatise puts it, "that not only are most engagements to marry arrived at informally and without witnesses or written record, but in many instances there is no explicit

[9] In its April 21, 1999 amended memorandum, the trial court concludes that Tenn. Code Ann. § 36-3-401 is "definitionally unclear" and then states: "Does this mean a complete written contract or a writing supporting the conclusion that a promise or contract of marriage exists? If the latter, then Mr. Rivkin's Quitclaim Deed to Ms. Postal renders moot a determination of whether the promise or contract has been proven by at least two 'disinterested witnesses.' Therefore, considering all the foregoing, the Court will not place a construction on the statute which would be the most extreme deviation from common law or antique appellate decisions governing the breach of promise of marriage." Ms. Postal's appellate brief characterizes the trial court's reasoning as follows: "The trial court appears to have interpreted the quitclaim deed executed by Mr. Rivkin shortly after the purchase of the Harpeth School Road property, to possibly constitute the type of writing called for by the statute. . . . However, the trial court did not elaborate further on how it found the deed to satisfy the requisites of the statute."

exchange of promises at all." 1 Clark § 1.2. Accordingly, proof of an engagement would be impossible if the plaintiff were required to produce evidence that at some specific moment the parties formally exchanged promises and reduced these promises to writing. Tenn. Code Ann. § 36-3-401 is not intended to go that far. Rather, it calls for signed, written evidence that the parties were, by mutual agreement, on the way to becoming husband and wife. Many kinds of writings would suffice.[10]

Mr. Rivkin testified that he gave Ms. Postal a joint tenant's interest in the Williamson County house as a way of making sure that their child would be provided for should something happen to him. In his words, the quitclaim deed was executed "for the child, in the event something happened to me; [so] that the child would have a house to live in." If we discount this explanation because the trial court stated that it "disbelieve[d] Mr. Rivkin and his denial of any agreement to marry Ms. Postal," we are left with no other direct evidence of Mr. Rivkin's reasons for this conveyance. Ms. Postal herself conceded that Mr. Rivkin never explained to her why he quitclaimed an interest in the Williamson County property to her.

Thus, the only evidence we have regarding the significance of the deed is the deed itself. Nothing within the four corners of the deed alludes to any promise or contract of marriage or to the parties' betrothed status. Executing quitclaim deeds is not only within the province of persons who have agreed or contracted to marry the grantee named in the deed. Quitclaim deeds are commonly used for business transactions between partners, conveyances between family members, cleaning up a title for title insurance purposes, or gifts. Thus, in light of the ubiquitous nature of quitclaim deeds, we decline to hold that an unexplained quitclaim deed between an unmarried man and an unmarried woman, without much, much more, suffices as signed, written evidence of a promise of marriage for the purpose of Tenn. Code Ann. § 36-3-401.

## B.
### Testimony of Two Disinterested Witnesses

Without a writing signed by Mr. Rivkin, Ms. Postal's only remaining avenue for proving that Mr. Rivkin promised to marry her consisted of presenting at least two disinterested witnesses who could substantiate Mr. Rivkin's promise. The requirement that a witness be "disinterested" is a familiar legal concept.

### 1.

Unlike today's rules of evidence, the old common-law rules of evidence disqualified persons from testifying if there was any concern that they were dishonest, that they did not fully appreciate the sanctity of the oath, that they were biased either for or against one of the parties, or that they were

---

[10]While not intended to be an exhaustive list, the following signed writings might fit the bill: an application for a marriage license, an attested petition to waive the age or waiting requirements for marriage, correspondence between the parties, writing dealing with wedding arrangements, or pre-nuptial agreements.

interested in the outcome of the proceeding in any way. 3 Spencer A. Gard, *Jones on Evidence* § 20:1 (6th ed. 1972) ("Jones on Evidence"). Thus, over one hundred years ago, Mr. Justice Brewer wrote that "[i]t is familiar knowledge that the old common law carefully excluded from the witness stand . . . those who were interested in the result; and this rule extended to both civil and criminal cases. Fear of perjury was the reason for the rule." *Benson v. United States*, 146 U.S. 325, 335, 13 S. Ct. 60, 63 (1892).

By the end of the Sixteenth Century, parties in civil lawsuits were considered incompetent to testify in their own cases. The principle rationale for their exclusion from the stand was the law's fear that their testimony would be untrustworthy. As unbelievable as it seems today, even criminal defendants were disqualified for interest from testifying during their own prosecutions. *Faretta v. California*, 422 U.S. 806, 850-51, 95 S. Ct. 2525, 2549 (1975) (Blackman, J., dissenting); *Ferguson v. Georgia*, 365 U.S. 570, 574-75, 81 S. Ct. 756, 759 (1961). By the mid-Seventeenth Century, the courts began to apply the disqualification rule to non-party witnesses. *Ferguson v. Georgia*, 365 U.S. at 573, 81 S. Ct. at 759.

This blanket disqualification rule began to erode over time. In 1843, England abrogated the rule in civil cases by statute. *Ferguson v. Georgia*, 365 U.S. at 575, 81 S. Ct. at 760. In this country, many states, including Tennessee, also enacted statutes during Reconstruction doing away with the common-law disqualification for interest rules. Shannon's Code of Tennessee § 5596 (1896); Donald F. Paine, *Tennessee Law of Evidence* § 151, at 170 (1974). Today nothing remains of the old common-law rule debarring witnesses from testifying because of an interest in the proceeding. Now all persons presented as witnesses must, as a general matter, simply meet the competency requirements of Tenn. R. Evid. 601 through 603.

**2.**

Superimposed on this general background are the unique evidentiary rules applicable to cases involving claims for breach of promise or contract of marriage. At one time, the parties in these cases, as in other civil proceedings, could not testify in their own behalf because they were disqualified for interest. *Lewis v. Tapman*, 45 A. at 462. The English Parliament removed the disqualification in breach of promise cases in 1869.[11] The Tennessee General Assembly had accomplished the same result one year earlier when it enacted the first of several statutes permitting

---

[11]The preamble to the Evidence Further Amendment Act, 1869, 32 & 33 Vict. 68 (Eng.) states, in part, "Whereas the discovery of truth in courts of justice has been signally promoted by the removal of restrictions on the admissibility of witnesses, and it is expedient to amend the law of evidence with the object of still further promoting such discovery . . ." Section 2 of the Act provides: "The parties to any action for breach of promise of marriage shall be competent to give evidence in such action: Provided always, that no plaintiff in any action for breach of promise of marriage shall recover a verdict unless his or her testimony shall be corroborated by some other material evidence in support of such promise."

parties and interested persons to testify in civil cases.[12]  By necessary implication, these statutes applied to actions for breach of promise or contract to marry.

Permitting plaintiffs to establish their breach of promise claims with nothing more than their own testimony was most likely one of the "allied evils"[13] the Tennessee General Assembly set out to address in 1949.  The enactment of Tenn. Code Ann. §§ 36-3-401, -402, while not a full return to the common-law rule disqualifying parties and interested persons as witnesses, was a studied step back in that direction.  As a result of these statutes, interested witnesses remain competent to testify, which is more than what the common-law rule permitted.  However, their testimony alone can never carry the day.  With reference to the plaintiff's burden of proof, the testimony of parties and other interested witnesses can only corroborate the testimony of at least two "disinterested witnesses" or the written evidence of the promise to marry.  Of course, any showing of interest on the part of a witness will continue to affect the weight of the witness's testimony.  *Creeping Bear v. State*, 113 Tenn. 322, 326, 87 S.W. 653, 653-54 (1905).

### 3.

All this brings us to the precise question that appears to have perplexed the trial court in this case – who is a "disinterested witness" for purposes of Tenn. Code Ann. § 36-3-401?  To find the answer, we begin with the statute itself.  The term "disinterested witness" is a legal term of art of long standing.  Thus, we must give this term its technical meaning unless the context makes plain that some other meaning was intended.  *State v. Smith*, 893 S.W.2d 908, 929 (Tenn. 1994) (Reid, J., concurring & dissenting in part); *Cordis Corp. v. Taylor*, 762 S.W.2d 138, 139-40 (Tenn. 1988).  The language of law is as full of terms of art as any other mode of professional discourse.  In this context, "disinterested witness" happens to be such a term.  Thus, as Justice Frankfurter once wrote, ". . . if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."  Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

The concept of "disinterestedness" is commonly associated with a person's ability to be impartial.  As applied to witnesses, a "disinterested witness" is one who has no right, claim, title, or legal stake in the claim or matter at issue.  *Carlon Co. v. Board of Review*, 572 N.W.2d 146, 150 (Iowa 1997).  Thus, a "disinterested witness" does not stand to gain a benefit or suffer a detriment as a result of the outcome of the case, *Jones v. Larrabee*, 47 Me. 474, 475 (Me. 1860) (separate opinion by Goodenow, J.); *Smith v. Stribling*, 649 A.2d 1003. 1006 (Pa. Commw. Ct. 1994); *State v. Easterlin*, 39 S.E.250, 251 (S.C. 1901); 1 Simon Greenleaf, *A Treatise on the Law of Evidence* §§ 390, 395 (15th ed. 1892) ("Greenleaf"), and thus has no motivation based on personal or pecuniary interest.  *Sands v. Prudential Prop. & Cas. Ins.*, 789 So. 2d 745, 748 (La. Ct. App. 2001).

---

[12]Act of Mar. 13, 1868, ch. 75, 1867-1868 Tenn. Pub. Acts 94; see also Act of Dec. 17, 1868, ch. 7, 1868-1869 Tenn. Pub. Acts 7; Act of Feb. 24, 1870, ch. 78, § 1, 1869-1870 Tenn. Pub. Acts 95.

[13]Eldridge, 21 Tenn. L. Rev. at 452.

Frequently, statutes and contracts require persons selected to place a value on property to be "disinterested." In this context, a disinterested appraiser is one who is impartial, unbiased, free from partisanship, and able to do equal justice between the parties. *Heller v. Hartz Mountain Indus., Inc.*, 636 A.2d 599, 605 (N.J. Super. Ct. 1993). Thus, as the Tennessee Supreme Court has noted, the term "disinterested, as applied to appraisers, does not simply mean lack of pecuniary interest, but requires the appraiser to be one not biased or prejudiced." *Hickerson & Co. v. Insurance Cos.*, 96 Tenn. 193, 203, 33 S.W. 1041, 1043 (1896).

A pecuniary interest, of course, involves having a direct or indirect financial stake in the outcome of the proceeding. *See generally* Tenn. Code Ann. § 39-16-101(3) (1997); *Creeping Bear v. State*, 113 Tenn. at 325-26, 87 S.W. at 653 (comparing pecuniary interests to other potential influences on a witness' testimony). In determining whether pecuniary interest exists, the courts look not at how great or how little money may be at stake but rather at the nature of the interest. 3 *Jones on Evidence* § 20:6. The pecuniary advantage or personal interest may be, in some cases, indirect or removed. For example, a witness may not be considered disinterested if the witness desires a certain outcome that could then be used in support of the witness's own monetary claims or as defenses against monetary claims in another action. 1 Greenleaf §§ 386, 404. Thus, a creditor of one of the parties, who may be testifying with an eye toward a fund that he or she may later pursue, may not qualify as a disinterested witness. 1 Greenleaf § 392.

**4.**

Because we have already determined that the March 1996 quitclaim deed does not suffice as written evidence of a promise to marry for the purpose of Tenn. Code Ann. § 36-3-401, Ms. Postal's breach of promise claim hinges on whether she produced at least two disinterested witnesses to substantiate her claim that Mr. Rivkin had promised to marry her. The only witnesses she called regarding this issue were her parents, Diana Schuyler and Barry Postal. While it is doubtful that a claimant's parent can ever be a disinterested witness in cases of this sort, Ms. Postal's parents are clearly not disinterested witnesses because at the time of trial they were also Ms. Postal's creditors.

Ms. Postal turned to her parents for financial support in 1997 when Mr. Rivkin stopped supporting her. She borrowed money from Ms. Schuyler which she used to pay the mortgage, to pay the utility bills, to purchase food, and to pay for her child's school expenses. Ms. Schuyler also loaned Ms. Postal $10,000 to enable her to purchase her current home. Ms. Schuyler testified that she expects her daughter to repay her, and Ms. Postal testified that she intended to use her recovery in this case to repay her mother.

The story regarding Ms. Postal's father is essentially the same. At the time of trial, he was living with Ms. Postal and was apparently being supported by her. He had loaned his daughter $8,500 to help her purchase her current home, and he also expected to be repaid. He even attempted to intervene in this case to recover the money he had loaned his daughter. The last question put to Mr. Postal by Mr. Rivkin's lawyer was "Are you interested in whether you get your money back or not, sir?" Mr. Postal's answer was simple and direct: "Yes, I am."

It is plain that both Mr. Postal and Ms. Schuyler had immediate, outstanding financial claims against their daughter when they testified in support of her breach of promise claim against Mr. Rivkin. Each of them expected that their claims would be satisfied once Ms. Postal got something out of this suit. Therefore, both had a financial interest in the outcome of this proceeding. In light of these witnesses' financial stake in the outcome, the trial court erred by concluding that they were "disinterested witnesses" for the purposes of Tenn. Code Ann. § 36-3-401.

## C.

In summary, we have concluded that Ms. Postal failed to carry the statutory burden of proof placed on persons seeking money damages for a breach of promise or contract of marriage. Her own self-serving testimony was insufficient. Tenn. Code Ann. § 36-3-402. She offered no written evidence that this promise or contract ever existed, and she failed to produce the two disinterested witnesses required by Tenn. Code Ann. § 36-3-401 to substantiate her claim. Accordingly, we find that the evidence preponderates against the trial court's finding that Mr. Rivkin had promised or contracted to marry Ms. Postal.

## IV.
### MS. POSTAL'S PROOF OF DAMAGES

Mr. Rivkin also takes issue with the $150,000 damage award by asserting that Ms. Postal failed to prove that she had been damaged by his refusal to marry her. This issue is now largely academic in light of our conclusion that Ms. Postal failed to prove that Mr. Rivkin ever promised or agreed to marry her. It would be anomalous to award damages for breach of contract in the absence of proof of the existence of a contract. However, the issue merits some comment in light of the unique nature of the damages in cases of this sort.

Even though breach of promise of marriage claims are essentially contract claims, the measure of damages is not the same as the customary measure of damages for breach of contract. When it comes to damages, "the complexion of the action mysteriously changes from contract to tort, with the corresponding broadening of the principles governing the damages which the... [fact-finder] may impose." 1 Clark § 1.4. Cases of this sort are all about the plaintiff's character and honor. By filing the suit, the plaintiff, usually a woman, "declares herself suitable for a wife, and the mother of a family," *Weeks v. Mays*, 87 Tenn. at 443, 10 S.W. at 771, and seeks to recover damages for the harm done to her happiness, honor, and character. *Goodal v. Thurman*, 38 Tenn. (1 Head) 209, 215 (1858). These damages are based upon (1) disappointment of reasonable expectations of social, domestic, and material advantage from the promised marriage, (2) injury to the plaintiff's future prospects in life, (3) harm to the plaintiff's affections, and (4) anguish and mortification stemming from the rejection. *Brown v. Odill*, 104 Tenn. at 265-66, 56 S.W. at 844.

Ms. Postal never articulated at trial exactly what specific social, domestic, and material advantages she expected to derive from marrying Mr. Rivkin that she had not already obtained. Nor did she testify about the injuries to her future expectations, her mental anguish and mortification, or

how not being married to Mr. Rivkin had destroyed her happiness, honor, and character. Simply asserting that she "would certainly have gained such advantages" by a marriage is no substitute for proof. Thus, in addition to failing to present sufficient evidence of the existence or a promise or contract of marriage, Ms. Postal failed to present any evidence regarding the sorts of injuries that would have entitled her to $150,000 in damages.

## V.
### THE DIVISION OF THE PARTIES' JOINTLY-OWNED PROPERTY

The remaining issues involve the manner in which the trial court divided the parties' jointly-owned property. Mr. Rivkin takes issue with the trial court's decision to award Ms. Postal a 1993 GMC pickup truck, a cedar chest that once belonged to his grandmother, and a share of the proceeds from the sale of the parties' Williamson County house. Ms. Postal complains that the trial court should not have reduced her share of the jointly-owned property by $2,000 because of the damage to Mr. Rivkin's gold and platinum records before she returned them to him. We will consider each of these issues in turn.

### A.

This case involves parties whose association is simply one of cohabitation rather than one of marriage. Accordingly, the factors in Tenn. Code Ann. § 36-4-121 (Supp. 2000) and the other principles governing the division of marital property are inapplicable. *Martin v. Coleman*, 19 S.W.3d 757, 761 (Tenn. 2000); *Kohler v. Flynn*, 493 N.W.2d 647, 649 (N.D. 1992).[14] The principles governing the division of jointly-owned property in cases such as this one are derived from the statutes and legal precedents involving the partition of jointly-owned property.[15]

Outside marriage, the right to insist on a division of property depends on common legal ownership, not simply cohabitation. *Kohler v. Flynn*, 493 N.W.2d at 649. Accordingly, the first task of the court is to identify the parties' property and then classify each piece of property either as belonging to one of the parties or as being jointly owned. *Spafford v. Coats*, 455 N.E.2d 241, 243-45 (Ill. App. Ct. 1983); *Rissberger v. Gorton*, 597 P.2d 366, 369-70 (Or. Ct. App. 1979). The court should award each piece of separately-owned property to its owner, and then turn its attention to the jointly-owned property. It is only the jointly-owned property that is subject to partition.

---

[14] Because Mr. Rivkin and Ms. Postal never held themselves out as married, any of the equitable principles generally used to divide the property of ersatz husbands and wives likewise also have no application. *See, e.g., Pickens v. Pickens*, 490 So.2d 872, 875-76 (Miss. 1986) (employing an implied partnership theory to divide a couple's property); *Goode v. Goode*, 396 S.E.2d 430, 435-39 (W. Va. 1990) (dividing a longtime couple's property using theories of implied contract and constructive trust).

[15] Tenn. Code Ann. §§ 29-27-101, -219 (2000).

Partitioning the jointly-owned property should be consistent with the respective co-owners' interests as shown by the evidence. Tenn. Code Ann. § 29-27-116. Even though joint owners are entitled to a partition in kind, *Helm v. Franklin*, 24 Tenn. (5 Hum.) 404, 404-05 (1844), most personal property is not subject to be divided in kind. Accordingly, partitions of jointly-owned personal property will most often entail selling the jointly-owned property and then dividing the proceeds of the sale consistently with the co-owners' interests. Tenn. Code Ann. §§ 29-27-201, -218(a). A partition of jointly-owned property need not be equal.

**B.**
**The Proceeds from the Sale of the Williamson County Property**

We turn first to the proceeds from the sale of the parties' property in Williamson County that Mr. Rivkin purchased in February 1996 for $420,000. In March 1996, Mr. Rivkin quitclaimed the property to himself and Ms. Postal as tenants in common with rights of survivorship. The parties sold the property by agreement in August 1998, and the proceeds of this sale, after paying the outstanding mortgage, amounted to $86,524.88. The trial court awarded Mr. Rivkin and Ms. Postal equal shares of the proceeds. Mr. Rivkin now asserts that the trial court erred by awarding Ms. Postal any interest in these proceeds because she failed to prove that he intended to give her an interest in the property.

A party seeking to establish an interest in property by gift must prove (1) that the donor intended to make a gift to the donee and (2) that the donor delivered or transferred the property to the donee. *Dunlap v. Dunlap*, 996 S.W.2d 803, 814-15 (Tenn. Ct. App. 1998); *Arnoult v. Griffin*, 490 S.W.2d 701, 710 (Tenn. Ct. App. 1972). Ms. Postal proved both donative intent and transfer in this case. The language of the quitclaim deed itself [16] is evidence of Mr. Rivkin's present intent to convey ownership of the property to Ms. Postal. *Cf. Denton v. Denton*, 33 S.W.3d 229, 232-33 (Tenn. Ct. App. 2000) (holding that grant language in a deed is rebuttable evidence of donative intent). The evidence that Mr. Rivkin caused the quitclaim deed to be recorded provides the evidence of delivery. *Smalling v. Terrell*, 943 S.W.2d 397, 399 n.4 (Tenn. Ct. App. 1996); *Mast v. Shepard*, 56 Tenn. App. 473, 479, 408 S.W.2d 411, 414 (1966).

Mr. Rivkin's attempt to undermine the legal significance of the quitclaim deed by asserting that he did not understand the legal import of a quitclaim deed was too weak to rebut Ms. Postal's evidence. Jointly-owned real property may be partitioned in kind, or the proceeds from its sale may be divided into equal shares. In light of the evidence that Mr. Rivkin gave Ms. Postal an undivided one-half interest in the property by executing and recording the quitclaim deed in March 1996, the trial court did not err by awarding each party an equal share of the proceeds of the sale of the property.

---

[16]The quitclaim deed recites, in part, "I, David B. Rivkin, Grantor, by these presents, do hereby quitclaim and convey unto David B. Rivkin and Lori Postal, Grantees, their heirs and assigns, as joint tenants in common with right of survivorship, all my right, title and interest in the following described property in Williamson County . . .."

## C.
## The 1993 GMC Pickup Truck

Mr. Rivkin also takes issue with the trial court's decision to award Ms. Postal the 1993 GMC pickup truck. Even though the truck was titled in both parties' names, Mr. Rivkin complains that he paid over $22,000 for the truck and that the trial court's ruling shortchanged him of his interest in the truck. We do not agree.

Ownership is a purely legal concept. 3 Roscoe Pound, *Jurisprudence* 129 (1959). It connotes a "bundle of rights" or legally protected interests with regard to specific property. *Woods v. M.J. Kelley Co.*, 592 S.W.2d 567, 570 (Tenn. 1980). Included in this bundle of rights are (1) the right of possession, enjoyment, and use, (2) an unrestricted right of disposition, and (3) the right of testamentary disposition. *Gracey v. Maddin*, 769 S.W.2d 497, 500 (Tenn. Ct. App. 1989); *State ex rel. Elvis Presley Int'l Mem'l Found. v. Crowell*, 733 S.W.2d 89, 96-97 (Tenn. Ct. App. 1987); Ray A. Brown, *The Law of Personal Property* § 1.5, at 6 (3d ed. 1975). Proof of ownership generally involves evidence with regard to possession and exercise of one or more of the prerogatives in this bundle of rights. Thus, ownership is a question for the trier-of-fact to determine from the evidence.

To determine ownership of a vehicle, a trier-of-fact may consider and weigh evidence relating to (1) the circumstances surrounding the vehicle's purchase, (2) the registration of the vehicle, (3) all aspects of insuring the vehicle, (4) all parties' financial stake in the vehicle, (5) the actual possession of the vehicle, (6) the responsibility for bearing the expense of operating, maintaining, and licensing the vehicle, and (7) the ultimate right to control the vehicle, including the right to make major decisions concerning the vehicle such as its use and restrictions on its use or the sale or other disposition of the vehicle. *Cunningham v. Department of Safety*, No. 01A01-9509-CH-00411, 1997 WL 266851, at *2 (Tenn. Ct. App. May 21, 1997) (No Tenn. R. App. P. 11 application filed). Mere titling of a vehicle is not conclusive evidence of ownership. *Smith v. Smith*, 650 S.W.2d 54, 56 (Tenn. Ct. App. 1983); *Polland v. Safeco Ins. Co.*, 52 Tenn. App. 583, 588, 376 S.W.2d 730, 732 (1963).

The disputed 1993 GMC pickup truck was titled in both parties' names. Mr. Rivkin made the payments on the truck while he was living with Ms. Postal; however, the evidence is clear that the truck was intended for Ms. Postal's primary use. She drove it for her transportation and used it in connection with raising and training horses. After the couple separated in 1997, Mr. Rivkin stopped paying on the truck because he considered it to "her" truck and "her" responsibility. Ms. Postal had exclusive possession of, use of, and responsibility for the truck while the parties were living together and after the parties separated. Under these circumstances, each truck payment that Mr. Rivkin made while the parties were still living together amounted to a gift to Ms. Postal. Accordingly, we cannot say that the evidence preponderates against the trial court's conclusion that Mr. Rivkin gave the truck to Ms. Postal.

## D.
## The Cedar Chest

-14-

Finally, Mr. Rivkin asserts that the trial court erred by awarding Ms. Postal a cedar chest that had belonged to his grandmother. Mr. Rivkin brought the chest from Minnesota when the parties began living together. When asked during the trial why she wanted this chest, Ms. Postal replied: "It's just because I can store stuff in it, but it is Mr. Rivkin's." In light of the undisputed evidence that the chest belonged to Mr. Rivkin, the trial court should have returned it to him. Accordingly, we reverse the portion of the judgment awarding the cedar chest to Ms. Postal. On remand, the trial court should enter an order directing Ms. Postal to return the chest to Mr. Rivkin forthwith.

### E.
### The Off-set for Damage to Mr. Rivkin's Gold and Platinum Records

Ms. Postal takes issue with the trial court's decision to reduce her share of the proceeds from the sale of the Williamson County property by $2,000 to compensate Mr. Rivkin for the damage to his gold and platinum records before she returned them to him. She asserts that this reduction was improper because (1) Mr. Rivkin did not request it in his pleadings, (2) Mr. Rivkin did not prove that she caused the damage to the awards, and (3) the amount of the off-set is purely speculative.

Mr. Rivkin left a number of items of personal property in the Williamson County house when the juvenile court ordered him to move out. Among this property were several awards, including a framed multi-platinum record plaque and a golden reel tape award. After Mr. Rivkin moved out, Ms. Postal and her mother removed the awards from the wall where they were hanging and laid them on the floor in anticipation that professional movers hired by Mr. Rivkin would soon remove them from the house. According to Ms. Postal, the parties' child defaced the awards while they were on the floor. Ms. Schuyler then put the awards in the garage where they were further damaged by her daughter's pets. The trial court observed the awards and described them as "all marked up and damaged" and "defaced very badly."[17] After Mr. Rivkin testified that these awards could not be repaired or replaced, the trial court deducted $2,000 from Ms. Postal's share of the proceeds from the sale of the house to compensate Mr. Rivkin for the damage.

Mr. Rivkin's August 1997 complaint for partition and to recover his personal property did not specifically request monetary relief for the damage to his gold and platinum records. However, it is not altogether clear that Mr. Rivkin knew that his awards had been damaged when he filed his complaint. The complaint did contain a prayer for general relief, and courts may properly grant whatever relief a prevailing party has proved that it is entitled to. Tenn. R. Civ. P. 54.03; *Aaron v. Aaron*, 909 S.W.2d 408, 412 (Tenn. 1995). Ms. Postal did not object to the trial court's consideration of the damage to Mr. Rivkin's awards, and both Ms. Postal and Mr. Rivkin presented evidence regarding the matter. Accordingly, even though Mr. Rivkin's complaint did not specifically pray for this relief, we have concluded that the parties tried the issue by consent.

---

[17] The trial court added that "I'm looking at them, and the court is not happy with what it sees."

Ms. Postal also insists that the trial court should not have reduced her share of the house sale proceeds because Mr. Rivkin failed to prove that she caused the damage to his awards. However, even if the trial court believed Ms. Postal's explanation of how the awards were damaged, the fact that she did not deliberately damage the awards would not necessarily relieve her of responsibility. As the bailee of Mr. Rivkin's property, Ms. Postal was required to use diligence and attention commensurate with the value of the property. *Pennington v. Farmers' & Merchants' Bank*, 144 Tenn. 188, 194, 231 S.W. 545, 547 (1921). The facts of this case support a conclusion that Ms. Postal did not exercise reasonable care by removing Mr. Rivkin's irreplaceable awards from the wall and leaving them where they could be damaged by children and pets.

Finally, Ms. Postal asserts that the off-set is inappropriate because it is speculative. It is a basic principle of damage law that damages are too speculative to be awarded only if the existence of damage is uncertain, not merely when the amount of damage is uncertain. *Church v. Perales*, 39 S.W.3d 149, 172 (Tenn. Ct. App. 2000); *Jennings v. Hayes*, 787 S.W.2d 1, 3 (Tenn. Ct. App. 1989). The evidence required to support a damage award need only establish the amount of the damages with reasonable certainty. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). The amount of damages is a question of fact. *Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 594 (Tenn. 1994). Thus, following a bench trial, we review the record to determine whether the trial court adopted the wrong measure of damages or whether the evidence preponderates against the amount of damages the trial court awarded. *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998).

Ms. Postal cannot claim that the existence of Mr. Rivkin's damage is speculative. After all, the evidence is undisputed that Mr. Rivkin's awards were damaged and that they were damaged while they were in Ms. Postal's possession. In addition, the trial court examined the awards and remarked that they were damaged and defaced. Thus, the only colorable argument Ms. Postal can make is that Mr. Rivkin failed to prove that damage to his awards was worth $2,000. While Mr. Rivkin did not place a dollar amount on the damage to his gold and platinum records, he testified that they could not be replaced. In light of this testimony which stands unrefuted, we have concluded that the evidence does not preponderate against the trial court's decision that Mr. Rivkin has suffered $2,000 in damages and that this amount should be deducted from Ms. Postal's share of the proceeds from the sale of the Williamson County property.

## VI.

For the reasons stated herein, we have determined that the trial court erred by awarding Ms. Postal $150,000 on her breach of promise claim and by awarding Ms. Postal the cedar chest that had belonged to Mr. Rivkin's grandmother. Accordingly, we reverse these portions of the judgment and remand the case to the trial court for the entry of orders consistent with this opinion. We tax the costs of this appeal in equal proportions to David Rivkin and his surety and to Lori Postal for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE